Thank you. We'll proceed to our arguments this morning. We have four cases set for argument. We may or may not take a break at some point, so if you could keep an eye on where we are, we would appreciate that. Our first case this morning is United States v. Campbell, number 23-6186, and counsel, you may proceed. Amy Senna Good morning, Your Honors. Assistant Federal Public Defender Amy Senna on behalf of the appellant, Michael Campbell. May it please the Court. Responding to a report of a backyard burglary, police arrived to find Mr. Campbell in the front driveway, holding a half-eaten hamburger, wearing a bright orange shirt and reading glasses, and playing loud music with his dog in his car. Despite arriving just one minute after the 911 call, police observed no evidence around Mr. Campbell of a burglary supposedly just interrupted. He had no flashlight, no burglary tools, no potentially He handed over his wallet of his own accord, correctly gave the home's full address when asked, pointed to home security cameras filming their interaction, listed the name and occupation of his neighbor, identified the 911 caller by name as his wife, and asked police to call her back. These facts, when viewed with common sense and ordinary human experience, make the notion that Mr. Campbell was a burglar nonsensical. No reasonable officer could believe that a burglar would interrupt his crime to feed a hamburger to his dog, adamantly offer his ID to responding police, and then ask to call back the very person who called 911 in the first place. Because reasonable suspicion dissipated before police seized Mr. Campbell's Reasonable suspicion must exist at every moment throughout a detention, and the government has the burden to show that it did. Here, the government has never articulated, because it can't, how an objectively reasonable officer could continue to believe that Mr. Campbell was a burglar under the totality of the circumstances here. Well, I think the toughest fact for you in arguing that suspicion dissipated is this wasn't just a neighbor that called or someone happening by that thought they saw something in the back of the house. This was the homeowner who called and said, identified a black man and a woman who were removing things, she said, I believe, from her back porch, and police get there within one minute. And Mr. Campbell, who is a black man, is walking from the backyard of the home from where, you know, the homeowners call from that home. He's walking from the backyard. And so those are difficult facts. And I understand what you're saying about his attempt to say who he was and explain. But the officer knows that the homeowner has called and said, this is happening in my backyard. And one minute later, the officer gets there and there's someone coming from the backyard. That's pretty strong confirming facts, you know. So the idea that he wanted to confirm, you know, with Mr. Campbell that he resided there and continued to, you know, ask him to basically cooperate so that he could look and find his address and that sort of thing, I assume. Why is that, why does that dissipate the suspicion? So a couple of things, Your Honor. My understanding of the record is that he was by the trash cans. I don't believe the officer saw him walking from the backyard. Well, he's outside at the home, which the homeowner called from, or called, I don't know if the homeowner was there, but it's the home, the address she identified as her home. And he's coming from the backyard one minute later. I don't know that it matters exactly where he is. Sure. It's certainly strong corroborating evidence of the homeowner's call. So I think the one minute fact actually cuts both ways. So I agree that at the very beginning, that's certainly, Mr. Campbell's in a bad spot, as Your Honor has said. But actually the fact that the homeowner said there's people in the backyard removing things, the officer arrives a minute later. At the beginning, it looks bad, but then the officer's able to see that there aren't any things around Mr. Campbell that have been removed that could be stolen property. And there's no evidence that he's engaged in a burglary. He doesn't have a mask. He doesn't have a flashlight. He doesn't have burglary tools. There's nothing for us to look at objectively in that moment. He's in the wrong place, certainly, but there's nothing to show that he was engaged in a burglary. And in fact, he's holding a hamburger. All the officer's trying to do is make sure that Mr. Campbell is who he says he is. That's all he's trying to do at this point. He wants to confirm with the homeowner, which makes sense, that he's who he says he is. Right. And so we might be in a different spot if the seizure of the firearm had happened exactly that second that the officer arrived. But we don't have to answer that question because five minutes passed before the officer sees the firearm. So we're just looking at whether there's reasonable suspicion after those five minutes. And the officer, of course, is not free to ignore all of the information that he learned in the meantime. Counsel, isn't it correct that A, it was at 11.45 p.m. at night? Secondly, that he didn't do what the officer wanted him to do. Raised his hands. He kept putting his hands down. And it was just sort of a fluky little event that the officer didn't know what was going on and he was trying to figure it out. Now, why does that immediately do away with reasonable suspicion? So, because... So we have to look at conduct in context, of course. We know that from all of the sports cases, but particularly Frazier, where evasive actions have to be viewed in context. And so here, we know from the video that the reason that he's reaching his hands, he's lowering his hands and reaching towards his pockets is because he's trying to grab his wallet to give it to the officer. He eventually succeeds in doing that, but the fact that he's willing to risk defying an officer's command to give his wallet is inconsistent with that of a identity. He says, can I give you my wallet? Over and over and over again. And finally, he just grabs the wallet and gives it to the officer. And so in context, that's not suspicious of burglary. It shows the exact opposite. And it's exactly what we would expect of a homeowner. And to Your Honor's point about the officer trying to figure it out, reasonable suspicion is an objective standard. We're not looking at what the officer subjectively was feeling or what he was trying to do. We just look at whether there's reasonable suspicion at the moment before the firearm is seized. And when we do that, the fact that the officer is trying to figure it all out and trying his best doesn't change the objective facts that existed in that moment. The court still has to look at those objective facts and then determine whether they support reasonable suspicion or not. And I think the cases cited in the briefing about suspicion of burglary are really helpful because they provide helpful contrasts on both sides. So you have the cases McCullough and Goble, and even a couple of cases cited by the government, Sanchez and Shelton, where the suspects didn't claim to be the homeowners. And the ones who did claim to have a valid reason, the court said that there was reasonable suspicion at the end that didn't dissipate because their stories didn't add up. In Goble, the suspect claimed he was picking up a friend at 3 in the morning but couldn't name the last name of the friend and didn't know the address, didn't even know the street that they were on. And here, Mr. Campbell, it's clear from context, he's doing everything he possibly can to try to convince the officer that he is a resident. He offers his car insurance paperwork. He lists the name of his neighbor. Those are the carters. She's a former police officer. You're on camera. We have ring. That's on my phone. These are all details that, you know, an officer doesn't have to accept as true, but using ordinary human experience and common sense are not details that burglars are going to be able to offer up to officers. Just looking at it. Counsel, I'm sorry to inject here. And if you want to continue with this, that's fine. But we've only got five minutes and there's your sentencing issue that we need to get to as well. But if you want to finish up with this and then we can get to that. Sure, Your Honor. I just wanted to focus on the Fourth Amendment issue because it provides my client with more relief. But I'm, of course, happy to. I understand. But I need to focus on the sentencing issue. So I'm hoping I'm looking for some help from you on that. Of course, Your Honor. So just just to wrap that up, I think, you know, those cases where there's suspicion of burglary are are helpful because this is not the same. And then the cases where there's no suspicion of burglary, Chavez and Evans are much more similar to our case where the objective facts don't show there was a burglary. Now to move on to the issue, Your Honor. Well, I'll throw the question out. If I'm understanding your argument correctly, it turns a lot on the Borden Supreme Court case where Justice Kagan's interpretation of the ACCA was that the language about the use of force against another would be limited to purposeful and knowing conduct. And then on the other hand, as I understand your argument, you're saying, well, the Oklahoma robbery statute doesn't specify mens rea. And as a result, under the case law, it's general intent crime. And you can commit the general intent crime with recklessness. So we don't have a categorical match with the ACCA. So far, so good. If I got your argument so far, so good. All right. So here's my question. Just looking at Borden a little bit more. And so the court says that force in the ACCA requires purposeful or knowing conduct. But there's reference to force in the Oklahoma robbery statute as well. It says that it has to be accomplished by means of force or fear. And not only that, but against the will. And it seems to me that Borden kind of cuts both ways for you. The interpretive principle of Borden is force requires purpose or knowledge. And yet we have force in the Oklahoma robbery statute. How do we deal with that? Sure. So this court, after Borden and the cases are cited in the opening brief, has interpreted Borden as saying that cases where the force could be applied recklessly do not satisfy Borden. So we know that anything less than that doesn't cut it. And so looking at Oklahoma case law, it's not just that the statute is silent and it's not just that it's a general intent crime. It's that if you look at how Oklahoma treats general intent crimes, that tells us that the use of force doesn't have to be employed with a mental state of purpose and knowledge. And we know that from Quinn and from Fairchild. Well, but I wonder if Justice Kagan would agree with that. I mean, she lays out this notion that if it's force against another, it can't be reckless. And we have force in this statute. So I think that can't be the right interpretation because this court, I believe in an assault case which requires force against another, this court said that it didn't meet the Borden standard. I believe that was the Devereux case. But so that interpretation of Borden is foreclosed, I suppose, by this court's case law saying that just because there's a use of force doesn't mean that it's purposeful. It can still be recklessly employed. And in Oklahoma, if there's no mens rea stated, which that's the case here, it doesn't require purpose or knowing force. Okay, I understand. I understand your argument. But that was bothering me a little bit. So I understand what you're saying. One other follow up, which is this. I'm just not seeing how you can have reckless robbery. And so it may be that in theory, under general intent, there's it could be committed recklessly. But don't you have a burden to show there's a realistic probability that Oklahoma would prosecute a reckless robbery? And I'm not seeing any examples of where that's ever happened. So I think we don't have a burden to show that it's a realistic possibility if there's case law interpreting the offense that way. And, you know, we have Traxler and Landell about robbery, and then we know how Oklahoma treats generals. Is the burden the other way? Is it on the government then? I think there's there's been some suggestion in this court's case law that if it's unclear, then we don't know that it's a categorical match. And then for that reason, you know, it's it's not a categorical match. Has to be clear. Right. Excuse me. Can I get one question in before you run out of time? Please do, Judge Kelly. Thank you. This is the first time on appeal that you're arguing this particular manner. Is it not? That's that's correct, Your Honor. So we're here on plain error. That's right, Your Honor. All right. I just want to make sure we're agreed on. Thank you. And I see my time has expired, but if I could respond just to your reckless robbery, how is it possible question? Okay, briefly, just briefly. I think the Anderson case, of course, that's a California case, but it shows exactly how this is possible. And it shows that if you have a statute in California statute is the language is nearly identical to Oklahoma's. It shows that it could possibly be prosecuted because it was if that had happened in Oklahoma, then then we'd be in the same situation. The Anderson. Yes. Thank you. Thank you, counsel. I please the court. Daniel Gridley for the United States District Court did not err in denying Mr. Campbell's motion to suppress nor in using Mr. Campbell's numerous armed robbery of convictions as violent offenses under the Armed Career Criminal Act. When we look at the specifics facts as officer Mullinex responded to the scene July 1st of 21 shortly before midnight. He had information as the court is pointed out that the the resident of that home was calling in actually observing. What was going on real time of a surveillance system? It was relayed that there was someone on the back porch that didn't belong there. And also it was relayed that there was a girlfriend that was home inside the home. Importantly, there was no mention of a male that was supposed to be there. Only that there was a male on the back porch that didn't belong. Obviously, as the courts mentioned, the officer arrived very quickly within a minute of the conclusion of that call. And if we start off with the uncontroverted information at this point in time, when officer arrived that there is reasonable suspicion that is uncontroverted here. I'd submit there are two things that happen very quickly shortly thereafter that escalate the situation, that increase the level of suspicion as to Mr. Campbell. One, the officer almost immediately upon arriving on scene, noticed what he observed and believed to be the butt of a gun magazine protruding from Mr. Campbell's waistband. Secondly, when he first arrives, there is a direct line of sight as he is approaching from his squad car. And officer Mullenix gives Mr. Campbell a clear direction to come here. And again, there's a direct line of sight, but Mr. Campbell doesn't do that. Instead, Mr. Campbell diverts behind his car that's backed in, near the back, the side back of the residence, the end of the driveway. And as things progressed, it went on and it went upward from there. The level of suspicion because of the evasive action that Mr. Campbell took. Mr. Campbell went around the back side of the car, comes over the driver's side. He again refuses to come to where the officer is directing him. And in fact, he wedges himself between the door frame and the door itself, putting again, something between him and that officer. And he, as the courts pointed out, he persists in bringing his hands down by his waist, which is assessed by the court in the Briggs case as being something significant to the issue of reasonable suspicion. To an officer responding to a situation such as this, where he believes that this suspect is armed with a firearm. So, as he is doing this also, Mr. Campbell is tensing up at four minutes into that video. He's tensing up as the officer's trying to manipulate his wallet while still holding him. He's balancing efforts to control the situation, but not to, in a way, de-escalate the situation. Also, you'll notice at three minutes and 14 seconds into that video, Mr. Campbell with his left arm subtly pulls his shirt down to cover what you eventually find out to be the firearm that's taken off of his left hip. All of these factors clearly show that there is reasonable suspicion. And Mr. Campbell wants to pigeonhole this simply into reasonable suspicion of a burglary. And that's one offense that could have been in play here. But I'd submit that there are a number of other offenses potentially. Simple trespassing. As the situation developed, and based on the Young case, certainly illegal possession of a firearm was another offense. Peeping Tom, stalking. The fact that Mr. Campbell had some familiarity with this home doesn't take him out of the level of suspicion here. There's a variety of circumstances and a variety of offenses at play that could be in fault besides a simple theft. So, given the totality of the circumstances here, the government would submit that the officer, Officer Molnax, was certainly in a position to reasonably be able to secure the situation while he looked into Mr. Campbell's claims, what essentially is going to require him calling and talking to the reporting party. And in order to do that, he's going to have to turn his back on Mr. Campbell and go back to his squad car where his phone is. Under these circumstances, with a man that he believes is armed, not following directions, continuing to reach down to his waistband, where the officer has seen what he believes to be a portion of a firearm, it's just not reasonable for the law to expect that he would turn his back on an individual in this situation, go back to his car, especially with another suspect at large in the area. Again, he's the only officer on scene at this point in time. So, the government would submit he was clearly within his right and under Williams, officers are authorized to take such steps that are reasonably necessary to protect their safety and to maintain the status quo during the course of their stop in order for him to call and talk to the reporting party. If there are no questions on that issue, I'd like to move on to the Armed Career Criminal Act issue. Can you address first her, the appellant's argument that in Devereaux, we said that if force is applied recklessly, that you can apply force recklessly, basically. Your Honor. In seeming contravention of Borden. Your Honor, I believe that's not consistent with a couple of things that Mr. Campbell just can't get around. One, the language of the Oklahoma statute. Well, I would like you to, if you can, to address the facts of Devereaux. That was the argument that counsel made. Are you referring to the California? If you don't know, that's fine. I'm sorry, it's not coming up. But I would submit that under the parameters of the Armed Career Criminal Act, Your Honor, there's a couple of things that Mr. Campbell can't get around. One is the language of the Oklahoma statute. The language of the Oklahoma statute, three statutes in particular, that come into play, section 801, section 791, and specifically section 792, which sets out to constitute robbery, the force or fear must be employed either to obtain or retain possession of the property. So the word employed there, I'd submit, is key. It is important. Well, I guess I'm going to try to get back to this a different way. I understand what the Oklahoma statutes say. I understand what the Oklahoma courts have said in Traxler and other cases about being a general intent crime. But the U.S. Supreme Court has seemingly said that use of force requires purposeful or knowing conduct. So we can't ignore what the U.S. Supreme Court said in Borden. Certainly. And this statute requires force. So how, I guess I'm back to Judge Matheson's question, to Appellant's counsel. How can we even pay attention to what Oklahoma said in 1952 when we have the Borden case, which would seemingly say that this Oklahoma statute, robbery statute, requires specific intent? It doesn't require specific intent in the sense of many, a handful of Oklahoma statutes, such as shooting with intent to kill, requires a specific intent of a special outcome. But it does require, as is required by Borden, a purposeful knowing mens rea. In other words, something above and beyond reckless or negligent. And that's what's set out in the Oklahoma statutes. And it's also made crystal clear, I would submit, in the Parnell case. Well, how can it be crystal if the words aren't used? I mean, you're saying, well, I'm going to interpret the word employed. But if you just go back to the definition of armed robbery, for example, the 791 provision, is there a mens rea set forth in the definition of robbery? Your Honor, I would— Just looking at the text. Of the statute, Your Honor? Correct. Okay. The text of the statute may be crystal clear in the sense that it's not directly set out specifically in that sense. But I would submit that when you look at the wording of Section 792 specifically, the word that is used is force must be employed. Well, and in 791, it also says accomplished by means of force. So I assume that's where you would pick up on that. But even so, haven't the Oklahoma courts, and in particular, Traxler, said, well, wait a minute, this is a general intent crime? Yes. And don't general intent crimes in Oklahoma include crimes committed recklessly? Well, I would argue that as specifically interpreted by Traxler, and even more specifically by Parnell, which holds, it can thus be seen that some act, word, gesture, or deed calculated to produce fear, calculated to produce fear or injury to property or person must be established by competent evidence. That when you read the Traxler case, the Parnell case, together with the statutory language of significance there, the Section 792, which requires employment of force, that language taken all together implies something more than reckless or negligence. It requires knowing even purposeful action in bringing about the force or fear. And thus, it meets the Borden requirements. Calculated is the word used by Parnell?  That's all right. We can find it. Yes. At 374 in Parnell, the language is calculated to produce fear or injury, which I would submit clearly implies something more than reckless negligence, things of that nature. Have the Oklahoma courts ever limited Traxler to the wrongful taking element of robbery? No. I'm aware of no cases, Your Honor, that limit it to the taking element. Although it might be helpful if they did for you, wouldn't it? Well, I would argue that it applies. I thought that you were arguing just the opposite in your brief, but all right. Well, in a way, the Traxler case dealt with the lack of a specific intent to steal. In other words, to permanently deprive. So, I thought that was your argument, too, that it would be limited to that lack of specific intent. It's limited in a way to the fact that there's no further intent, i.e., an intent to steal. It does have language that, if I can point out to the court, no intent is necessary except the intent of doing the act announced by the statute. And Mr. Campbell argues that that act announced by the statute is limited just to taking. There's no reason this court should say it's limited to taking and that it doesn't also logically apply to the use of force that's set out in the statute in Parnell. I guess I'm still stuck on the general intent crime argument that Mr. Campbell's making, that if this is a general intent crime, you've got recklessness, you can't fit ACCA. And let me have a sub-part to that question, if you don't mind. Do you have to show that it clearly does? To answer your second question first, if I may, I see I'm over time. Sure, sure. I'd submit no, that under the plain error doctrine, we're not contesting prong three and four. We're arguing that the court should find for us in prong one. And we would argue under this court's Fagatelli case, I'm not sure if I'm pronouncing that properly, Fagatelli case that it's incumbent upon Mr. Campbell to demonstrate that the statute can be violated with recklessness. I don't know if I've answered your questions. I think we've hit the over-limit time, but let's see. Judge Kelly, do you have anything further? No, thank you. Thank you, Counsel. Thank you, Your Honor. So I think time has expired. I appreciate the arguments.